UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| KIMBERLY COSTANZA,<br>CINDY BRADY, and<br>MICHAEL HILL, as individuals and<br>representative of a class of similarly<br>situated persons and/or entities,<br><br>   Plaintiffs,<br><br>v.<br><br>GOOGLE, INC, a DELAWARE<br>CORPORATION,<br><br>   Defendant, | § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 6:10-CV-626<br><br><br><br>CLASS ACTION COMPLAINT<br><br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

PLAINTIFFS, KIMBERLY COSTANZA, CINDY BRADY, and MICHAEL HILL, as individuals, and representatives of the class described herein, ("Plaintiffs") bring this CLASS ACTION against Defendant, Google, Inc., ("Google"), and upon information and belief, state the following in support of this complaint:

## PARTIES

1. PLAINTIFF, KIMBERLY COSTANZA, is a citizen of the State of Texas and resides in Smith County, Texas which is within the Eastern District of Texas, Tyler Division.

2. PLAINTIFF, CINDY BRADY, is a citizen of the State of Texas and resides in Smith County, Texas, which is within the Eastern District of Texas, Tyler Division.

3. PLAINTIFF, MICHAEL HILL, is a citizen of the State of Texas and resides in Smith County, Texas, which is within the Eastern District of Texas, Tyler Division.

1

4.      Plaintiffs are representative of a class of persons, and/or entities, within and throughout the entire State of Texas, who owned and operated an open wireless network at their home or business during a period of time between April 1, 2007 and May 31, 2010.

5.      Google is a Delaware corporation with corporate headquarters and principal place of business at 1600 Amphitheater, Parkway, Mountain View, California, 94043.

## JURISDICTION AND VENUE

6.      Pursuant to 28 U.S.C. § 1332, et seq., this Court has jurisdiction over this matter based on diversity of citizenship of the Plaintiffs and Google, and there being an amount in controversy that exceeds $75,000.00, exclusive of interest and costs.

7.      Pursuant to 28 U.S.C. § 1332, et seq., this Court also has jurisdiction over this matter based on the presumption that there are over 100 members in the Class of persons and/or entities represented by the Plaintiffs; that Plaintiffs' claims involve an aggregate amount in controversy that exceeds $5 million, exclusive of interest and costs; and the diversity of citizenship of the Plaintiffs and Google.

8.      Pursuant to 28 U.S.C. § 1331 this Court has jurisdiction over this matter based on the Plaintiffs' claims arising from Google's violation of the Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510 et seq.

9.      Pursuant to Texas Civil Practice & Remedies Code § 15.017, a suit for damages for Invasion of Privacy, (Intrusion on Seclusion), must be brought and can only be maintained in the county in which the Plaintiffs resided at the time of the accrual of the cause of action.

10.     Pursuant to 28 U.S.C. § 1391, venue is proper in the Eastern District of Texas due to Google being subject to personal jurisdiction in this District and due to the fact that a substantial part of the events giving rise to the claim occurred within this District.

## NATURE OF SUIT

11. This is a Class Action brought pursuant to Rule 23 of Federal Rules of Civil Procedure against Google for the intrusive and privacy violating conduct it intentionally engaged in while collecting data for use in its Google Street View application. Google Street View is a feature of both Google Maps and Google Earth that provides a ground level, panoramic view of streets throughout Texas, the United States and the world. In order to get these panoramic views, Google used cars, and other vehicles, equipped with cameras and drove them all over Texas, the United States and the world, taking pictures from virtually every angle of each address, intersection or other landmark that they drove past. In addition to cameras, the cars were equipped with Wi-Fi receivers, purportedly to identify Wi-Fi transmitters, including those in private homes and businesses, and triangulate them to connect the photos with corresponding map positions. However, Google also intentionally included distinct and specifically designed software in the Wi-Fi receivers to intercept and record the information that the Wi-Fi transmitters were transmitting as Google cars were driving past homes and businesses. That information was then stored by Google for purposes only known to Google at this time. The information intercepted and recorded included entire emails, email passwords and other private data belonging to the owners and occupants of the homes and businesses that Google cars passed. Based upon information that Google has been willing to disclose so far, Google began collecting information for its Google Earth Street View program in April of 2007 and continued such activity until it was caught "data scraping" from Plaintiffs', and others, wireless networks in May of 2010. Upon information and belief, Data Scraping is a term of art used to describe a technique in which a computer program captures and extracts human readable output that is coming from another program. Google's interception, recording and storing, or the attempt

thereof, of Plaintiffs' data was in violation of provisions of both Federal and Texas law as set forth in more detail below.

## STATEMENT OF FACTS

12. Google is a for-profit, publically traded corporation that owns and operates the world's most popular Internet search engine along with a multitude of other Internet services and offerings.

13. Google's business model is based in large part, if not exclusively, from generating advertising revenue based on the number of users of its Internet services. Included in that business model is the practice of seeking, acquiring, storing and then selling information collected from the users of its Internet services.

14. Google uses software programs, including various algorithms, to capture user data from the users of its various Internet services. Although licenses are sometimes "agreed" to by such users, those "license agreements" are voluminous and incomprehensible, and many users are unaware of the volume or nature of the data Google collects from them.

15. Google has a reputation for being aggressive about expanding its data collection and obtaining monetary benefit for the data it captures in total disregard for the privacy of the unsuspecting users of its ubiquitous software. According to the consumer advocacy group Consumer Watchdog, Google has a history of pushing the (privacy) envelope and then apologizing after their over reach is discovered.

16. In May of 2007, Google's CEO, Eric Schmidt, ("Schmidt"), told the Financial Times: "We are very early in the total information we have within Google …. The algorithms will get better and we will get better at personalization. ... The goal is to enable Google users to

be able to ask the question such as 'What shall I do tomorrow?' and 'What job shall I take?' ... We cannot even answer the most basic questions because we don't know enough about you. That is the most important aspect of Google's expansion."

17.     In September of 2008, in an interview with McKinsey Quarterly, Schmidt said: "When people have infinitely powerful personal devices, connected to infinitely fast networks and servers with lots and lots of content, what will they do? There will be a new kind of application and it will be personal. It will run on the equivalent of your mobile phone. It will know where you are via GPS, and you will use it as your personal and social assistant. It will know who your friends are and when they show up near you. It will remind you of their birthdays. ... When you go to school it will help you learn, since this device knows far more than you ever will."

18.     On or about September 15, 2010, Schmidt said: "But there is a new opportunity for monetization of social networks which I would call the yellow pages. You can see this in what Facebook is doing and you can see this in Google Places. There are physical things in social networks, stores for example. You can advertise against those objects and it looks like classifieds or like yellow pages. My guess is that there is a lot of revenue going to be. Location based services will be a big business for Facebook, Google or others."  See: http://faz-community.faz.net/blogs/netzkonom/archive/2010/09/15/google-ceo-eric-schmidt-we-don-t-pay-for-traffic.aspx

19.     It is against this backdrop, and within this corporate culture, as set forth above, that Google implemented and conducted its Google Maps Street View project.

20.     Google launched the Street View data collection project in the United States on or about April 1, 2007.

21. Google Street View is Google's technology that is featured in their Google Maps and Google Earth products. It links panoramic photographic images with specific locations covered by Google Maps and Google Earth.

22. Google obtained the photographic images by attaching multi-directional cameras to cars and other vehicles, and having those vehicles travel over the roads, streets, alleys and pathways, taking ground-level pictures of locations, including private homes and business. Google then incorporated that data into Google Maps and Google Earth.

23. In addition to being equipped with cameras, Google's vehicles were equipped with technology to collect information about and from Wi-Fi network locations.

24. Google's claimed purpose for collecting Wi-Fi network data was to improve the accuracy of location detection in its mobile service by associating the SSID (Service Set Identifier) broadcast by a Wi-Fi network with a particular location in its database.

25. By improving the accuracy of that information Google could determine where Wi-Fi capable mobile devices were connecting to services such as Google Maps and presumably determine a method to monetize such information.

26. However, monetizing location data was not enough for Google and the data collected by Google Cars went far beyond the SSID broadcast by the Wi-Fi networks, and included private data from open Wi-Fi networks such as URLs, passwords and email messages. This data transmitted between computers on a Wi-Fi network is sometimes referred to as "payload data".

27. Google did not admit it was collecting any Wi-Fi related data until April 27, 2010, after privacy concerns were raised by European governments and regulatory agencies. On April 27, 2010 in its European Public Policy Blog, Google claimed they only collected location data

from the SSID broadcasted by Wi-Fi networks. Google specifically and explicitly denied it collected and/or stored any payload data. See: http://googlepolicyeurope.blogspot.com/2010/04/data-collected-by-google-cars.html

28. Google admitted that they did not inform regulatory agencies that they were collecting Wi-Fi location data because, in part, others were engaging in the same activity and they didn't think it was necessary. Google did admit that in hindsight "greater transparency would have been better." See: http://googlepolicyeurope.blogspot.com/2010/04/data-collected-by-google-cars.html

29. On or about May 5, 2010, the The Data Protection Authority in Hamburg, Germany, ("DPA"), made a request to audit the data Google collected with Street View cars.

30. On or about May 14, 2010, Google "discovered" that its April 27, 2010 blog post had been "incorrect". Google finally admitted that its Google Street View cars had been collecting payload data from open Wi-Fi networks, but minimized it by claiming that only fragments of private data were collected. See: http://googleblog.blogspot.com/2010/05/wifi-data-collection-update.html

31. Google claimed that such data collection was a mistake, but admitted that software code, written by Google's engineers to sample all categories of publicly broadcast Wi-Fi data, was included in the software used on Google Street View cars to collect Wi-Fi data. In other words, Google Street View cars operated exactly as they were programmed..

32. On October 22, 2010, Google expanded its admission of "data scraping" and said they were "acutely aware that we failed badly here", and went on to admit that they were collecting the very Wi-Fi data they had just months before denied collecting. Moreover, Google was forced to admit that the payload data collected was not simply "fragments" of data as

previously represented, but in fact included the capture and collection of entire emails, URLs, passwords and other information. See: http://googleblog.blogspot.com/2010/10/creating-stronger-privacy-controls.html

33. Google never obtained the consent of any private home or business owner to use, take or publish pictures of their homes or businesses in Google's products, let alone collect data from their Wi-Fi networks.

34. In an interview on CNN's Parker Spitzer program broadcast on or about October 22, 2010, Google's CEO, Schmidt said that people who were upset about their homes appearing in Google Street View could "just move".

35. In October, 2010, Schmidt told the Atlantic magazine that, "Google policy is to get right up to the creepy line and not cross it,…"

36. PLAINTIFF, KIMBERLY COSTANZA's home appears in Google Street View and she owned and operated an open Wi-Fi network between April 1, 2007 and May 31, 2010. Her Wi-Fi network was not readily accessible to the general public. Ms. Costanza did not consent to Google collecting any of the data transmitted or stored on her Wi-Fi network.

37. PLAINTIFF, CINDY BRADY's home appears in Google Street View and she owned and operated an open Wi-Fi network between April 1, 2007 and May 31, 2010. Her Wi-Fi network was not readily accessible to the general public. Ms. Brady did not consent to Google collecting any of the data transmitted or stored on her Wi-Fi network.

38. PLAINTIFF, MICHAEL HILL's home(s) appeared in Google Street View and he owned and operated an open Wi-Fi network between April 1, 2007 and May 31, 2010. His Wi-Fi network was not readily accessible to the general public. Mr. Hill did not consent to Google collecting any of the data transmitted or stored on his Wi-Fi network.

39. The named Plaintiffs in this action are representative of a much larger class of persons that lived in the State of Texas, and owned and operated an open Wi-Fi network between April 1, 2007 and May 31, 2010. Their Wi-Fi networks weren't readily accessible to the general public. The class members did not consent to Google collecting an of the data transmitted or stores on their Wi-Fi networks.

## CLASS ALLEGATIONS

40. PLAINTIFFS bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, as individuals and on behalf of all members of the following class:

41. All persons located in the State of Texas who owned and operated an open Wi-Fi network at their home or business at anytime between the April, 2007 and May 2010, (the "Class"). Excluded from the Class are Google, including subsidiaries and affiliates, federal governmental entities and instrumentalities, and the court and court personnel.The Class is so numerous that joinder of all members is impracticable. Ultimately, the precise number of Class members must be the subject of discovery, but Plaintiffs allege that the numbers for the Class are at least in the thousands.

42. There are questions of law and fact common to the Class, including whether and to what extent Google engaged in, or attempted to engage in "data scraping" from Class members' Wi-Fi networks, whether Google's conduct was a violation of the laws set forth in the Causes of Action below, and to what remedies the Class members are entitled to as a result of Google's conduct.

43. Plaintiffs' claims are typical of the claims of all Class members in that they all maintained open Wi-Fi networks and were the victims of Google's conduct.

44. Plaintiffs will fairly and adequately protect the interests of the Class and are not in conflict with the interests of Class members. Further, Plaintiffs have retained competent counsel and counsel will fairly and adequately protect and represent the interests of the Class.

45. Plaintiffs assert that, pursuant to Fed. R. Civ. P. 23(b)(2), Google's actions apply generally to the Class and that, if necessary, final injunctive or declaratory relief is appropriate for the Class as a whole.

46. Plaintiffs assert that, pursuant to Fed. R. Civ. P. 23(b)(3), the questions of law and/or fact common to the Class members predominate over the question of individual members, and that this class action is a superior method for the fair and efficient adjudication of these claims.

## CAUSES OF ACTION

47. Google intentionally intercepted Plaintiffs' electronic communications in violation of 18 U.S.C. § 2511, et seq., known as the Federal Wiretap Act.

48. Google intentionally used a device, its Google Street Cars, to intercept Plaintiffs' electronic communications in violation of the Federal Wiretap Act.

49. Google intentionally obtained Plaintiffs' electronic communications while in storage in violation of 18 U.S.C. § 2510, et seq., known as the Electronic Communications Privacy Act.

50. Google intentionally intercepted Plaintiffs' electronic communications in violation of Texas' Civil Practice and Remedies Code § 123.001 et seq.

51. Google intentionally intercepted, or acquired, Plaintiffs' electronic communications in violation of Texas Penal Code § 16.02 et seq. Texas Code of Criminal

Procedure, Article 18.20 creates a private remedy for the violation of Texas Penal Code § 16.02 et seq.

52. Google's conduct, as set forth in this complaint, was an intentional invasion of privacy; specifically, an intrusion on Plaintiffs' solitude, seclusion and/or private affairs. Invasion of Privacy is a well recognized and established cause of action under Texas Common Law. Invasion of Privacy encompasses the tort of Intrusion on Seclusion. *Billings v. Atkinson*, 489 S.W.2d 858 (Tex. 1973),

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and as representatives of the Class, prays judgment be entered against Google and that this Court grant all relief allowable by Federal or Texas State Law, including but not limited to the following:

1. An order certifying the Class and appointing Plaintiffs and their counsel to represent the Class;

2. A judgment against Google for Plaintiffs' and the Class' asserted causes of action;

3. To the extent necessary, preliminary and permanent injunctive relief against Google;

4. A judgment and order requiring Google to pay each Plaintiff and Class member $100 a day for each violation or $10,000, whichever is greater, for the violation of 18 U.S.C. § 2511 et seq, along with an appropriate award of punitive damages;

5. A judgment and order requiring a disgorgement of profits made by Google as a result of its conduct, and at least $1,000 to each Class member for the violation of 18 U.S.C. § 2510 et seq., along with an appropriate award of punitive damages;

6. A judgment and order awarding each class member $10,000 for each occurrence, and actual damages in excess of $10,000 for a violation of Texas Civil Practice and Remedies Code § 123,001 et seq., along with an appropriate award of punitive damages;

7. A judgment and order awarding each class member of $100 a day, up to $1,000, for a violation of Texas Penal Code § 16.02 et seq., along with an appropriate award of punitive damages;

8. A judgment and order awarding each class member actual damages including those for personal injury such as mental anguish for the Invasion of Privacy encompassing intrusion on Plaintiffs' and Class members' seclusion, along with an appropriate award of punitive damages;

9. A judgment and order requiring Google to pay Plaintiffs the cost of this action, including all disbursements, and an award of attorneys fees as authorized by law;

10. Any and all other relief to which Plaintiffs and Class members may be entitled.

Respectfully submitted,

Dated: November 24, 2010

/s/ Eric H. Findlay
Eric H. Findlay
State Bar No. 00789886
Brian Craft
State Bar No. 04972020
Findlay Craft, L.L.P.
6760 Old Jacksonville Highway,

Suite101
Tyler, TX 75703
(903) 534-1100
(903) 534-1137 FAX
efindlay@findlaycraft.com
bcraft@findlaycraft.com

**ATTORNEYS FOR PLAINTIFFS
KIMBERLY COSTANZA,
CINDY BRADY, AND
MICHAEL HILL, AS INDIVIDUALS
AND REPRESENTATIVE OF A CLASS
OF SIMILARLY SITUATED PERSONS
AND/OR ENTITIES**

13